Filed 11/12/15  P. v. Morales CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>NESTOR MORALES,<br><br>　　Defendant and Appellant. | D066337<br><br><br><br>(Super. Ct. No. SCD251686) |

APPEAL from a judgment of the Superior Court of San Diego County, Kathleen M. Lewis, Judge.  Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Erica A. Swenson and Barry J. Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendant Nestor Morales appeals from a judgment of conviction after jury trial. Morales argues that (1) the trial court's permitting a police officer to testify as to the contents of a recording of a conversation between Morales and another man, in Spanish, while they were in the back of a patrol car after their arrest, violated the best evidence rule and that the recording itself should have been played for the jury, with an interpreter translating; (2) his conviction on count 2, possession for sale of a controlled substance (Health & Saf. Code, § 11378),[1] must be reversed because, he contends, it is a necessarily lesser included offense of count 1, which charged the sale of the same controlled substance (§ 11379, subd. (a)); and (3) pursuant to Proposition 47, he is entitled to have this court vacate his sentence and resentence him to a misdemeanor term for his conviction for violating section 11377.

We reject Morales's contentions and affirm the judgment of the trial court.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

At approximately 5:30 p.m. on October 16, 2013, San Diego Police Detective John Queen was pretending to be an amputee and was being pushed in a wheelchair by another officer through the downtown area. Queen was assigned to the Central

---

[1]    Further statutory references are to the Health and Safety Code unless otherwise specified.

Division Command Enforcement Team, and was on an undercover operation searching for drug dealers. Queen was carrying cash that he had obtained at the station to use to purchase drugs. He had given other officers in the operation photocopies of the bills he was carrying.

Queen saw Jose Pina and another man on the street. Queen asked them if they knew "anybody that's got it." Queen believed that the men understood him to be asking whether they knew anyone who had drugs to sell. Pina asked Queen what he was looking for, and Queen said he wanted " 'black,' " meaning tar heroin. Pina told Queen that he did not know where to get what Queen was asking for, but that his "homeboy" could get some " 'cris,' " which was "[s]treet slang for crystal methamphetamine." Queen replied that he would be interested in buying $60 worth of that drug.

Pina left Queen and spoke with other people who were nearby. When he returned to Queen, Pina said that his "homeboy" was located at 500 C Street. Pina ran toward that location, while Queen, pushed by his attendant, followed behind at a slower pace. Queen eventually caught up with Pina at the intersection of 6th Avenue and C Street. Pina informed Queen that he could not find his "homeboy." Queen offered to let Pina use Queen's cellular telephone. Pina gave Queen a number, which Queen dialed. Pina then used the telephone to speak with someone; Pina told the person on the other end of the telephone that he, Pina, had "60" and wanted to meet up. After hanging up, Pina told Queen that his "homeboy" was at the new central library.

3

After the men began to head toward the library, Queen asked Pina if he could call his "homeboy" back and ask to meet somewhere between their location and his location. Pina called the same number back and Queen heard him mention City College. After Pina hung up, he told Queen that they would be meeting his "homeboy" at the City College trolley station.

The three men then headed toward that trolley station. Queen agreed that he would pay Pina $10 for facilitating the drug purchase.

When the men arrived at the trolley station, Pina used Queen's cellular telephone to speak with his "homeboy" again. Pina, Queen, and Queen's attendant moved south on Park Boulevard. As they arrived at E Street, Pina pointed to Morales and said, "There he is."

Queen gave Pina three recorded $20 bills. Morales approached Pina and spoke with him. The group moved north to a Subway sandwich shop near the trolley station. Pina told Queen that Morales had to go into the restroom in the Subway sandwich shop to get the drugs.

Morales went into the Subway restroom and exited quickly. Queen observed Morales do a quick hand-to-hand exchange with Pina. Pina then approached Queen and handed him a bindle of methamphetamine. Queen handed Pina $10.

After this exchange, Queen gave his fellow officers a "bust signal" as he left the area. Uniformed officers moved in and arrested Morales and Pina. The officer who arrested Morales found him sitting in a chair in front of the Subway, holding the three $20 bills that Queen had given to Pina. Morales was found with a small baggie of

4

methamphetamine in his pocket, and a shoulder bag that contained four empty baggies and an electronic scale. The officer believed that Morales had disposed of another bindle of methamphetamine on the ground under his chair before being contacted by police. Morales had a cellular telephone in his possession, as well. The history log of the telephone included calls placed from Queen's cellular telephone.

Officers placed Morales and Pina in the same patrol car, which was equipped with an audio recorder. The two men conversed in Spanish, and their conversation was recorded.

B.     *Procedural background*

A jury convicted Morales of one count of sale, transportation or furnishing of methamphetamine (§ 11379, subd. (a); count 1); one count of possession for sale of methamphetamine (§ 11378; count 2); and one count of possession of methamphetamine (§ 11377, subd. (a); count 3). Morales admitted having suffered a strike prior, a prison prior, and a prior drug conviction.

The trial court sentenced Morales to an aggregate term of seven years in prison. Morales filed a timely notice of appeal.

III.

DISCUSSION

A.     *Even if we assume that the trial court erred in admitting Officer Sanchez's oral summary of the recorded conversation from the back seat of a patrol car, any error was harmless*

Morales contends that the trial court erred in allowing the prosecution to present Officer Jesus Sanchez's testimony regarding the contents of an audio recording of the

5

conversation between Morales and Pina while they were being held in the back of a patrol car.

After Morales and Pina were arrested, they were placed together in the back of a patrol car that was equipped with an audio recording device. While in the patrol car, the two men engaged in a conversation in Spanish. The recording was given to Detective Queen, who asked Officer Sanchez, a Spanish speaker, to listen to it.

At trial, the prosecution called Officer Sanchez to testify regarding the conversation that Morales and Pina had in the back of the patrol car. Sanchez testified that Morales and Pina were talking about the money that had been given to them. According to Sanchez, Morales asked Pina whether the money had been marked. Morales told Pina that officers had found "two drops" of methamphetamine on him, but that he did not think that officers had seen Pina hand him any money. During the prosecutor's examination of Sanchez, Morales, who was representing himself, objected that the actual recording of the conversation was "not here." When the court asked for Morales's legal grounds for his objection, Morales replied that the recording was "irrelevant." The court overruled Morales's objection.

Morales cross-examined Sanchez about the recording, questioning him regarding whether he was able to distinguish between the two speakers while listening to the recording. Sanchez stated that the voices on the recording were "distinct."

On redirect, Sanchez testified that the recording still existed, and that both parties had a copy.

6

On appeal, Morales argues that the prosecutor should not have been permitted to question Sanchez regarding the content of the recorded conversation. He contends that the audio recording constitutes a "writing" within the meaning of Evidence Code section 250, and that pursuant to Evidence Code section 1523, subdivision (a), "[e]xcept as otherwise provided by statute, oral testimony is not admissible to prove the content of a writing."[2]

Under the secondary evidence rule,[3] the content of a writing may be proved either "by an otherwise admissible original" (Evid. Code, § 1520) or by "otherwise admissible secondary evidence" (§ 1521, subd. (a); see *People v. Skiles* (2011) 51 Cal.4th 1178, 1187). Although subdivision (a) of Evidence Code section 1523 provides generally that oral testimony is not admissible to prove the content of a writing, there are a number of exceptions (see Evid. Code, § 1523, subds. (b)-(d)). The People contend that Officer Sanchez's testimony was admissible to describe the conversation on the audio recording pursuant to at least one of these exceptions.

We need not decide whether the trial court erred in permitting the prosecutor to elicit Sanchez's testimony about the content of the audio recording because we conclude that it is not reasonably probable that the exclusion of Officer Sanchez's

---

[2]     The People do not dispute that the audio recording at issue here is considered to be a "writing" for purposes of the applicable provisions of the Evidence Code.

[3]     "The so-called best evidence rule was codified as Evidence Code former section 1500 et seq. Effective January 1, 1999, it was renumbered and retitled, and is now called the secondary evidence rule. (See Evid. Code, § 1520 et seq.)" (*People v. Lucas* (2014) 60 Cal.4th 153, 264, fn. 42.)

testimony regarding the conversation at issue would have resulted in a different outcome for Morales.

We review the erroneous admission of evidence under the harmless error standard announced in *People v. Watson* (1956) 46 Cal.2d 818. (See, e.g., *People v. Chism* (2014) 58 Cal.4th 1266, 1298.) Under this standard, we do not reverse unless it is reasonably probable that there would have been a different result absent the court's error. (*People v. Watson*, *supra*, at pp. 834-838.)

There was abundant evidence establishing Morales's guilt, apart from the evidence of the recorded conversation between Morales and Pina. The prosecution presented uncontradicted evidence that Detective Queen told Pina that he wanted to buy methamphetamine. Pina arranged a rendezvous between Queen, Pina and Morales. Queen gave Pina three identifiable $20 bills. Officers watched Pina and Morales exchange something. Immediately after this exchange, Pina handed Queen $60 worth of methamphetamine. A few minutes later, Morales was found holding the three $20 bills that Queen had given to Pina. In addition, when officers arrested Morales, he had more methamphetamine, packaging material, and an electronic scale in his possession.

Given all of this evidence, the recording of a discussion between Pina and Morales that occurred after both were placed in a patrol car added little, if anything, to the weight of the evidence against Morales. In fact, the recording was so insignificant that the prosecutor did not even mention the recorded conversation during her closing argument. The only time that the prosecutor brought up the recorded conversation in

8

closing was when she responded to Morales's comments about the recording during her rebuttal argument, and then she argued only that the conversation corroborated the other evidence that had been presented at trial.

In view of the evidence presented at trial, there is no reasonable probability that if the trial court had precluded Sanchez from describing the recorded conversation, or if the trial court had required the prosecutor to play the recording for the jury (with a court interpreter to translate the conversation), the jury would have reached a different result. We therefore decline to reverse Morales's convictions on this ground.

B.  *The offense of possession for sale is not a lesser included offense of the offense of selling, transporting or furnishing drugs under the relevant legal authority; Morales may properly be convicted of both offenses*

Morales contends that his conviction for possession for sale, based on a violation of section 11378,[4] is a necessarily included lesser offense to his conviction

---

[4]     At the time of Morales's offense, section 11378 provided:

"Except as otherwise provided in Article 7 (commencing with Section 4211) of Chapter 9 of Division 2 of the Business and Professions Code, every person who possesses for sale any controlled substance which is (1) classified in Schedule III, IV, or V and which is not a narcotic drug, except subdivision (g) of Section 11056, (2) specified in subdivision (d) of Section 11054, except paragraphs (13), (14), (15), (20), (21), (22), and (23) of subdivision (d), (3) specified in paragraph (11) of subdivision (c) of Section 11056, (4) specified in paragraph (2) or (3) of subdivision (f) of Section 11054, or (5) specified in subdivision (d), (e), or (f), except paragraph (3) of subdivision (e) and subparagraphs (A) and (B) of paragraph (2) of subdivision (f), of Section 11055, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code." (Stats. 2011, ch. 15, § 172, eff. April 4, 2011, operative Oct. 1, 2011.)

9

for the sale of methamphetamine, based on a violation of section 11379.[5] Morales asserts that even though one may violate section 11379 in a number of ways (i.e., by transporting, importing into the state, selling, furnishing, administering, giving away, or offering or attempting to do any of those things), the statute "should be treated as setting out a series of discrete offenses, with the statutory elements test applied to the version charged" in the charging document.

---

[5] At the time of Morales's offense, section 11379 provided:

> "(a) Except as otherwise provided in subdivision (b) and in Article 7 (commencing with Section 4211) of Chapter 9 of Division 2 of the Business and Professions Code, every person who transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport any controlled substance which is (1) classified in Schedule III, IV, or V and which is not a narcotic drug, except subdivision (g) of Section 11056, (2) specified in subdivision (d) of Section 11054, except paragraphs (13), (14), (15), (20), (21), (22), and (23) of subdivision (d), (3) specified in paragraph (11) of subdivision (c) of Section 11056, (4) specified in paragraph (2) or (3) of subdivision (f) of Section 11054, or (5) specified in subdivision (d) or (e), except paragraph (3) of subdivision (e), or specified in subparagraph (A) of paragraph (1) of subdivision (f), of Section 11055, unless upon the prescription of a physician, dentist, podiatrist, or veterinarian, licensed to practice in this state, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of two, three, or four years.

> "(b) Notwithstanding the penalty provisions of subdivision (a), any person who transports for sale any controlled substances specified in subdivision (a) within this state from one county to another noncontiguous county shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for three, six, or nine years." (Stats. 2011, ch. 15, § 174, eff. April 4, 2011, operative Oct. 1, 2011.)

"In general, a person may be convicted of, although not punished for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of any number of the offenses charged." ' " (*People v. Reed* (2006) 38 Cal.4th 1224, 1226-1227 (*Reed*).) "Section 954 generally permits multiple conviction. Section 654 is its counterpart concerning punishment. It prohibits multiple punishment for the same 'act or omission.' When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited." (*Reed*, *supra*, at p. 1227.)

"A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' [Citation.] '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " (*Reed*, *supra*, 38 Cal.4th at p. 1227.)

The question whether one offense is necessarily included in another arises in various contexts, including the situation in this case, i.e., multiple convictions on *charged* crimes, as well as another common situation, involving the question whether a defendant charged with one crime may be convicted of a lesser *uncharged* crime. (*Reed*, *supra*, 38 Cal.4th at p. 1227.) In the latter situation, courts "have applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the 'elements' test and the 'accusatory pleading' test." (*Ibid.*) "Under the elements test, if the statutory elements of the greater offense include all of the

11

statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*Id.* at pp. 1227-1228.)

In *Reed*, the Supreme Court concluded that for purposes of determining whether a defendant may stand convicted of two *charged* offenses, a court is to consider *only the statutory elements of the two relevant offenses*, and should not consider the charging document, in determining whether one offense is necessarily included in the other. The *Reed* court explained:

> "As we noted in *People v. Montoya* [(2004)], 33 Cal.4th [1031,] 1035, the Court of Appeal decisions that specifically consider this question have concluded that the accusatory pleading test does not apply in deciding whether multiple conviction of charged offenses is proper. [Citations.] Now that the question is squarely presented, we agree. In deciding whether multiple conviction is proper, a court should consider only the statutory elements. Or, as formulated in *Scheidt*, 'only a statutorily lesser included offense is subject to the bar against multiple convictions in the same proceeding. *An offense that may be a lesser included offense because of the specific nature of the accusatory pleading is not subject to the same bar*.' (*People v. Scheidt* [(1991) 231 Cal.App.3d 162,] 165-166.)" (*Reed*, *supra*, 38 Cal.4th at p. 1229, italics added.)

Morales contends that the *Reed* court did not consider what he terms a "divisible offense," i.e., an offense that may be committed by engaging in any one of multiple specifically enumerated alternative acts. Section 11379 is one of these "divisible offenses" because one may violate it in a number of different ways. According to Morales, a court should be permitted to treat "divisible statutes as a

12

series of alternative [independent] offenses, each separately subject to the statutory elements test," because such a rule "would not lead to the absurd results that concerned the High Court in *Reed*."

Morales's proposal would create a hybrid rule in which the statutory elements are applied to the particular alternative act that forms the basis of the charge against the defendant. Such a rule would necessarily require a court to consider the accusatory pleading to determine which of the alternative acts the defendant is accused of committing. Under *Reed*, however, we are to look solely to the elements of the two statutes at issue, and *not* to the particular accusatory pleading in a case, to determine whether the defendant may be properly convicted of both charged crimes. *Reed* leaves no room for the hybrid test that Morales proposes, since such a test is, in effect, an accusatory pleading test.

As Morales implicitly acknowledges by arguing in favor of the use of a "hybrid" test in this situation rather than the required statutory elements test, Morales's convictions on counts 1 and 2 would both stand under a faithful application of the statutory elements test. The offense defined in section 11378, which makes it unlawful to "possess[] for sale a controlled substance" is *not* a necessarily included offense of the offense defined in section 11379, subdivision (a), which makes it unlawful to "transport[], import[] into this state, sell[], furnish[], administer[], or give[] away, or offer[] to transport, import into this state, sell, furnish, administer, or give away, or attempt[] to import into this state or transport any controlled substance[.]" Although possession of a controlled substance is often a circumstance that exists when

13

one transports a controlled substance or offers to transport, import, sell, furnish, administer, or give away a controlled substance, possession is not *necessarily* required to do any of these things. For example, one may violate section 11379 by transporting drugs, without necessarily committing the offense of possession under section 11378, since one may be liable for transporting by aiding and abetting a transporter, without being in either actual or constructive possession of the drugs. We therefore conclude that section 11378 is not a lesser included offense of section.11379. Morales may stand convicted on both counts 1 and 2.

C.    *Morales must file a petition for recall of his sentences after judgment is final*

Morales contends that he is entitled to automatic, nondiscretionary resentencing under Proposition 47 with respect to his conviction for possession of a controlled substance under section 11377. Morales asserts that this court should reduce his conviction on that count to a misdemeanor.

"On November 4, 2014, voters enacted Proposition 47, the Safe Neighborhoods and Schools Act . . . . (Prop. 47, as approved by voters, Gen. Elec. (Nov. 4, 2014), eff. Nov. 5, 2014.)." (*People v. Delapena* (2015) 238 Cal.App.4th 1414, 1421 (*Delapena*).) In part, Proposition 47 reclassified certain felony drug and theft related offenses as misdemeanors, and enacted a new statutory provision whereby an individual already serving a felony sentence for the reclassified offenses may petition for a recall of his or her sentence. (*Delapena*, *supra*, at pp. 1421-1422, citing Pen. Code, § 1170.18, subd. (a).)

14

As established by Proposition 47, Penal Code section 1170.18 provides the statutory remedy for "[a] person currently serving a sentence for a conviction, whether by trial or plea, of a felony or felonies who would have been guilty of a misdemeanor under the act that added this section ('this act') had this act been in effect at the time of the offense." (Pen. Code, § 1170.18, subd. (a).) Under this provision, such a person "may petition for a recall of sentence before the trial court that entered the judgment of conviction in his or her case to request resentencing in accordance with Sections 11350, 11357, or 11377 of the Health and Safety Code, . . . as those sections have been amended or added by this act." (Pen. Code, § 1170.18, subd. (a).)

According to Morales, because the judgment in his case was not final at the time Proposition 47 became effective, he is entitled to have this court reduce his conviction to a misdemeanor under amended section 11377, and he need not utilize the resentencing procedure established in Penal Code section 1170.18.[6] We disagree.

The court in *Delapena*, *supra*, 238 Cal.App.4th at pages 1426-1429, recently concluded that Proposition 47 does not operate retrospectively to entitle a defendant such as Morales—a defendant who has been sentenced but whose judgment is not final—to automatic resentencing on an appeal from the judgment. We adopt the reasoning of *Delapena*, and agree with the *Delapena* court's conclusion that the

---

[6] Morales filed a request for judicial notice in which he asks this court to judicially notice two items related to the legislative history of Proposition 47: (1) a document entitled "Senate Floor Concurrence AB 721," and (2) the official text of Proposition 47, as passed by the voters on November 4, 2014. We grant Morales's request for judicial notice.

language of Proposition 47 indicates that it was intended to apply prospectively, not retroactively. Morales is thus not entitled to have this court automatically reduce his conviction under section 11377 to a misdemeanor. Rather, Morales must utilize the procedure specified in Penal Code section 1170.18, which requires that he file a petition for recall of sentence in the trial court after the judgment in this case becomes final. (See *Delapena*, *supra*, at p. 1429.)

IV.

DISPOSITION

The judgment of the trial court is affirmed.

AARON, Acting P. J.

WE CONCUR:

IRION, J.

PRAGER, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.